UNITED STATES of America, Plaintiff,

v.

SIXTY (60) ACRES, MORE OR LESS WITH IMPROVEMENTS, LOCATED IN ETOWAH COUNTY, ALABAMA, Defendant,

Evelyn Charlene Ellis, Claimant.

Civ. A. No. 89–AR–0348–M.

United States District Court,
N.D. Alabama, M.D.

Jan. 5, 1990.

Frank W. Donaldson, U.S. Atty., Robert P. Barclift, Asst. U.S. Atty., Birmingham, Ala., for plaintiff.

Robert R. Black, pro hac vice, David Cromwell Johnson, Johnson & Cory, P.C., Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

This is a forfeiture proceeding instituted by the United States pursuant to 21 U.S.C. § 881(a)(7) against sixty (60) acres owned by claimant, Evelyn Charlene Ellis. Initially, the parties demanded a trial by jury, but before a jury could be selected they both waived their right to jury trial, and the court proceeded to hear testimony and to receive written evidence at a bench trial.

The United States first offered evidence to meet its burden of proving the existence of "probable cause" for believing that Mrs. Ellis' sixty acres was substantially connected with one or more proscribed activities, in this instance, one or more drug transactions. This court thereupon found the existence of "probable cause" and will not here repeat its orally stated findings and conclusions on that subject. Thereafter, Mrs. Ellis presented her evidence in support of her claim of personal innocence, and the United States concluded by offering rebutting evidence. After receiving and considering post-trial briefs from both parties, it becomes incumbent upon the court to make findings of facts and state conclusions of law.

### Findings of Pertinent Fact

It was undisputed that at all times pertinent, including the late night of January 31, 1989, when Mrs. Ellis' husband, Hobert Ellis, undertook to sell marijuana on Mrs. Ellis' property and thus precipitated this forfeiture proceeding, Mr. Ellis lived with Mrs. Ellis in the residence owned by her and located on her sixty-acre tract in Etowah County, Alabama. Late that night, Mr. Ellis was in the middle of negotiating a sale of marijuana to an undercover informant just outside the Ellis house when various law enforcement officers suddenly interrupted the transaction upon receiving a prearranged radio signal from the informant, who was wired. The informant's code words were, "This looks like good stuff!" Mr. Ellis fled, leaving a trail of marijuana behind him. At the time of this particular attempted sale, Mrs. Ellis was snug in her bed inside the house and was blissfully unaware of what was going on outside until the law enforcement officers entered with a search warrant. Mr. Ellis obtained his marijuana on January 31 from a garbage bag which he had stashed in the weeds outside of Mrs. Ellis' house but within the curtilage. A subsequent thorough search of the house by the F.B.I. and by Etowah County sheriff's deputies uncovered no drugs or drug paraphernalia. The United States offered no evidence whatsoever of drug-related activities conducted on the premises except a few feet from the residence. Mrs. Ellis neither actually knew about, nor expected, *this particular marijuana transaction* before or at the time Mr. Ellis undertook it. This court finds, however, that Mrs. Ellis was generally aware of Mr. Ellis' drug activities conducted from or on her property for a considerable period of time leading up to January 31. She was not only aware of the drug enterprise which had landed Mr. Ellis in jail on an earlier occasion, but Mr. Ellis' pattern of behavior after he got out of jail was obvious to any careful observer and could not have escaped Mrs. Ellis' notice. After all, the two resided in the same house, and he could not hide everything from her, particularly his frequent hush-hush meetings with visitors who were not neighbors or personal friends and who had no social or legitimate business reason for visiting the premises. Mrs. Ellis says that her husband's business was growing turnips, but she had to know that the turnip market in Etowah County was not sufficient to create

the volume of traffic which arrived at the Ellis' door. Mrs. Ellis may have successfully turned her head upon certain of her husband's transactions so as to be able to say, with honesty, "I didn't know about that," but she could not turn her head permanently and completely so as to insulate herself entirely from all knowledge of her husband's drug dealings conducted from and on her premises. In fact, prior to Mr. Ellis' earlier drug conviction, Mrs. Ellis was a participant in his nefarious enterprise and was thus aware of his proclivities, although he was supposed to have "learned his lesson."

The key witness for the United States was Charles Rasner, an F.B.I. special agent. Agent Rasner was present during the drugbust on January 31. When he interviewed Mrs. Ellis afterwards, Mrs. Ellis denied any knowledge of her husband's current drug dealings but went on to say that she had lived in fear of bodily harm from him. On this point, this court believes that what Mrs. Ellis told Agent Rasner is true. In other words, if Mrs. Ellis had undertaken to squeal on her husband or to kick him out of the house as a means of avoiding the possible consequences of 21 U.S.C. § 881(a)(7), she probably would have placed herself in personal jeopardy. The degree of her endangerment is unknown, and probably unknowable. She took no affirmative action to stop her criminally inclined husband from conducting his drug enterprise unless it was, perhaps, to nag him until he told her in no uncertain terms to mind her own business. In a sense, she watched and waited with a feeling of helplessness while her husband engaged in his criminal enterprise. The extent and kind of dominance which Mr. Ellis exercised over Mrs. Ellis was not fully developed in the evidence. The court did not see or hear from Mr. Ellis himself. He is incarcerated. Perhaps the most telling comment on Mr. Ellis' character and on the nature of his relationship with Mrs. Ellis came from a post-event interview which Todd Entrekin, Etowah County narcotics officer, conducted with Kelly Ellis, Mrs. Ellis' teenage daughter, who resided with Mr. and Mrs. Ellis.

Mr. Entrekin's written report of February 1, 1989, contained the following:

> Kelly Ellis told us she was scared of Hobart [sic] and did not know what he would do to her mother, if she talked to us. She said that she did not get into Hobarts [sic] business.

This admissible hearsay was believable, and the court believes it.

### Conclusions of Law

This court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

After the United States retreated from the position it took early in this case that the subject sixty acres was equitably owned in whole or in part by Mr. Ellis himself by virtue of an old alleged "sham" conveyance, the only serious questions of law that remained for resolution were: (1) whether or not this owner, whose real property was criminally used by another, could avoid forfeiture by proving that she was unaware of the *particular* drug transaction which precipitated the forfeiture proceeding; or, in the alternative, (2) whether or not this owner could avoid forfeiture by proving that she did not "consent" to her husband's drug activities, using the definition of the statutory word "consent" suggested by the owner. This case therefore calls for a construction of 21 U.S.C. § 881(a)(7), which by its terms placed upon Mrs. Ellis the burden of proving either that she had no knowledge of, or did not consent to, the use by her husband of any portion of her sixty acres to conduct or to facilitate the commission of a drug crime.

Is the Required "Knowledge" or "Consent" Limited to the One Transaction Which Precipitated the Forfeiture Proceeding?

Mrs. Ellis asks this court to broaden the Eleventh Circuit's "substantial connection" requirement as discussed by that court in *United States v. A Single Family Residence*, 803 F.2d 625, 628 n. 1 (11th Cir.1986). If the so-called "predicate offense" in this case is the single marijuana transaction which took place on the night of January 31, then this case falls into the same category as *United States v. All*

*Those Certain Lots in Virginia Beach,* 657 F.Supp. 1062 (E.D.Va.1987), in which that court found that the single sale of a controlled substance, standing alone, is insufficient to establish a "substantial connection" between the real property and the "predicate offense." Several courts have routinely used the term "predicate offense," although this term itself nowhere appears in the statute. If this repeated use of the term "predicate offense" is meant to imply that a single, discrete occurrence, of which the owner had knowledge or to which she consented, is necessary to trigger a forfeiture, this court finds that the term has been incorrectly employed. It is true that the statute refers to "any act or omission." These are *singular* words, a fact that may have caused confusion. The draftsmen of this statute certainly could have done a better job. Nonetheless, this court has little difficulty in ascertaining a Congressional purpose to forfeit property if that property has been used by any person or persons as part of a *pattern* of alleged conduct or a *series* of occurrences. In other words, forfeiture does not depend upon the existence of a single proven "act" or "omission" known by or consented to by the owner. In the pre-trial order, the United States' statement-of-position said: "Claimant, Charlene Ellis, had knowledge of her husband's illegal drug activity and/or consented to such activity." Because this court construes § 881(a)(7) broadly enough to encompass a series of transactions or a pattern of illegal activity, the absence of actual knowledge by Mrs. Ellis of her husband's single "act" on January 31, is not enough to meet her burden of proving an absence of knowledge of or consent to Mr. Ellis' periodic illegal drug sales which preceded January 31, about which she was generally aware.

## The Statute

Section 881(a)(7) provides:

(a) The following shall be subject to forfeiture to the United States and no property rights shall exist in them:

\* \* \* \* \* \*

(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the *knowledge or consent* of that owner.

(emphasis supplied).

## Lack of Knowledge as a Defense

 As noted, Mrs. Ellis failed to meet her burden of proving that she lacked "knowledge" of all of the nefarious acts or omissions of her husband, even though she did prove to the satisfaction of the court that she lacked specific knowledge of the single nighttime marijuana sale conducted by Mr. Ellis on January 31. She therefore did not prove the lack of knowledge which would exempt her property from forfeiture under § 881(a)(7).

Mrs. Ellis argues that if she had any knowledge her knowledge was "constructive" and not "actual" and therefore was not the kind of knowledge contemplated by § 881(a)(7). For this proposition, she relies on *United States v. Four Million Two Hundred Fifty-five Thousand Dollars,* 762 F.2d 895 (11th Cir.1985). The court rejects this principle for application to this case. Although the fact of Mrs. Ellis' "actual" knowledge is primarily deduced from circumstantial evidence, her knowledge nevertheless was "actual." It was not vicarious. The court did not attribute it to her solely by virtue of her marital relationship with a drug dealer. Not only was there ample circumstantial evidence upon which the court could and did find actual knowledge by Mrs. Ellis of her husband's illegal activities, but there was credible *direct* evidence of her actual knowledge of these illegal acts committed on more than one occasion prior to January 31, and the United States

did not put all of its eggs in the circumscribed basket of the one occasion on the night of January 31. In the pre-trial order, the United States conspicuously did *not* say:

> Claimant, Charlene Ellis, had knowledge of her husband's illegal drug sale on January 31, 1989, upon which the United States relies for this forfeiture proceeding.

### Absence of Consent, as an Alternative Defense

◼ To repeat, the United States said in the pre-trial order:

> Claimant, Charlene Ellis, had knowledge of her husband's illegal drug activity *and/or* consented to such activity ...

(emphasis supplied).

It would appear from its use of the "and/or" language that the United States is ambivalent about what it believes to be the extent of Mrs. Ellis' burden of proving the "innocence" necessary to avoid a forfeiture under § 881(a)(7). In its brief and trial approach, the United States seemed to stand on the proposition that Mrs. Ellis had the burden of proving both a lack of "knowledge" *and* a lack of "consent," or, in other words, that her "consent" was necessarily implied from her "knowledge." The United States has avoided any attempt at an in-depth analysis of the "consent" element as a separate matter for inquiry. If the position of the United States is that the "or" which separates "knowledge" from "consent" in § 881(a)(7) really means "and," or that the word "or" has no real meaning, that position is identical to the position which the United States recently took before the Third Circuit in *United States v. Property Known as 6109 Grubb Road*, 886 F.2d 618 (3rd Cir.1989), wherein the Third Circuit said in response to the government's said argument:

> The government argues that if the owner fails to show lack of knowledge by a preponderance of the evidence, that in itself is sufficient to subject the property to forfeiture. The government feels that the statute was the codification of existing common law. The language of the statute provides "that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C.A. § 881(a)(7). We must determine whether Congress intended for knowledge alone to be sufficient to lose the "innocent owner" defense or whether DiLoreto is correct in her assertion that knowledge of the illegal usage does not deprive the owner of an interest when the owner can demonstrate the property was used without her consent.

*Id.* at pp. 623–624.

\* \* \* \* \* \*

The construction of the innocent owner defense is a case of first impression in this court. Our research reveals only one published opinion in which a federal court has examined whether the "knowledge or consent" phrase in § 881(a)(7) has established independent defenses. In *United States v. Certain Real Property & Premises Known as 171–02 Liberty Avenue, Queens, New York*, 710 F.Supp. 46 (E.D.N.Y.1989), [*171–01 Liberty Avenue*] the district court for the Eastern District of New York was presented with a case where the owner of property in a high drug-trafficking area knew that his property was being used as a base to sell "crack" although he received no profit from the dealings. The government claimed that the owner's knowledge was sufficient to lose the innocent owner defense and forfeit the property. The owner countered that the statute provided an innocent owner defense to an individual who could show lack of "knowledge or consent" and therefore it was enough for him to establish that he did not consent to the illegal use of his property. 710 F.Supp. at 48–49.

The district court in *171–02 Liberty Avenue* concluded that even if an owner has knowledge of the illegal use of his property, he may nonetheless prove innocent ownership by showing a lack of

consent. The court reasoned that the use of *or* in the statute (knowledge or consent) means that each word must be given its independent and ordinary meaning. *171–02 Liberty Avenue*, 710 F.Supp. at 50. In so ruling, the court relied on the canons of statutory construction as enunciated by the Supreme Court. *See Reiter* [*v. Sonotone Corporation* ], 442 U.S. [330] at 339, 99 S.Ct. [2326] at 2331 [60 L.Ed.2d 931 (1979)] ("canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings unless the context dictates otherwise"); *and, FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (terms connected by a disjunctive must be given separate meaning).

Reading "knowledge or consent" as the canons of construction require, we conclude that Jane DiLoreto can show innocent ownership by proving by a preponderance of the evidence that the illegal use of the property occurred either without her knowledge or without her consent.

*Id.* at p. 626.

As *Grubb Road* presented a case of first impression for the Third Circuit, Mrs. Ellis' case presents an issue of first impression for this court and for the Eleventh Circuit. This court sees no reason why the Eleventh Circuit should not follow the Third Circuit, which, in turn, followed the Eastern District of New York in *171–02 Liberty Avenue* and gave the disjunctive word, "or," its ordinary meaning. The question, then, is not whether forfeiture can be avoided by Mrs. Ellis by proving the lesser alternative proposition, namely, that she did not "consent" to her husband's illegal activities, but whether she did, in fact, prove by a preponderance of the evidence an absence of "consent" by her to those activities. To resolve this question requires that the court understand and articulate the correct definition of "consent" in the context of this particular forfeiture statute.

If this were a criminal statute instead of a civil statute, albeit a statute with strong penal characteristics, this court would necessarily apply the "rule of lenity" and would strictly construe the statute against the United States, resolving all ambiguity in Mrs. Ellis' favor. Here, however, the strong remedial purpose contemplated by Congress seems obviously to imply an intent to require of a property owner more than passivity and more than a calculated turning of the head to drug activity on the property. During a colloquy between the court and counsel for the United States, counsel conceded, with no seeming reluctance, that Hon. Eugene P. Spellman of the Southern District of Florida in *United States v. Certain Real Property*, 724 F.Supp. 908 (S.D.Fla.1989), was correct when he expressed the opinion that § 881(a)(7) contains no requirement that a person claiming the status of an "innocent owner" establish that he has done all he could reasonably be expected to do to prevent the proscribed use of his property. This was a somewhat remarkable concession because it is inconsistent with what seems to be the position of the Solicitor General. Obviously, if Mrs. Ellis had done all she could reasonably be expected to have done to prevent the proscribed use of her property by Mr. Ellis, she could not be found to have "consented" to that proscribed use. This court has already found as a fact that Mrs. Ellis was legitimately afraid of her husband, who obviously did not consult her or seek her permission to engage in each and all of his drug transactions. If she voiced to him a plaintive objection from time to time to his continued criminal conduct, he simply ignored her and "put her in her place." Albeit inartfully, Mrs. Ellis has argued that "consent" here should be given its strict, dictionary meaning:

*Voluntary* accordance with, or concurrence in, what is done or proposed by another; acquiescence; *approval.*

*Webster's Collegiate Dictionary*, 5th Ed. (emphasis supplied).

A concurrence of wills. *Voluntarily* yielding the will to the proposition of another; acquiescence or compliance therewith. *Agreement; the act or result of coming into harmony or accord. Consent is an act of reason, accompa-*

**1420**

*nied with deliberation, the mind weighing as in a balance the good or evil on each side.* It means *voluntary* agreement by a person in the possession and exercise of sufficient mental capacity to make an intelligent choice to do something proposed by another. *It supposes a physical power to act, a moral power of acting, and a serious, determined, and free use of these powers. Consent is implied in every agreement. It is an act unclouded by fraud, duress, or sometimes even mistake.*

*Black's Law Dictionary,* 5th Ed. (emphasis supplied).

This court thinks that Congress had a little more in mind when it used the word "consent" in § 881(a)(7) than these strict dictionary meanings. At some point the obligations of citizenship in a drug-ridden society must overcome spousal loyalty and even spousal intimidation. The line between "consent" and "non-consent" is not an easy line to draw in this case, but the court draws it so as to conclude that Mrs. Ellis failed to carry her burden of proving the lack of "consent" within the meaning of that word which this court understands to represent the Congressional intent. Mrs. Ellis did not offer proof of the kind or character of duress or of control or of dominance which would have precluded her from exercising the degree of responsibility of citizenship which required her to take at least *some* overt action to deter her husband's course of action. After all, one of the dictionary synonyms for "consent" is "acquiescence," which embraces something less than an affirmative joinder in a particular decision. This court agrees with the Third Circuit in *Grubb Road* that "knowledge," although a separate issue, is a predicate to "consent." That predicate exists here. This court also agrees with the Third Circuit when it went on to say:

However, *we would note that knowledge can imply consent under appropriate circumstances.*

What, if any, applicability the following dictum in *Calero–Toledo v. Pearson Yacht Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974) has to the innocent owner defense will be for the district court to decide: "that he [claimant] had done all that reasonably could be expected to prevent the proscribed use of his property...." The problem is particularly daunting where, as here, entireties property is involved. Certainly the government's suggestion that an innocent spouse should seek partition of the entireties property not only lacks legal substance but, in any event, defies marital reality.

In making these observations, we do not intend to minimize the difficult task that will be presented to the district court in arriving at its factual conclusions. The problem is particularly acute with respect to the no consent issue when no pertinent evidence is available. *The illegal use of marital property by the spouse of the claimant can present a classic example of that situation. Certainly in resolving such a claim, emotional considerations must be kept in proper perspective lest they be employed subconsciously to negate the objectives of the forfeiture statute and to encourage the titling of such property to that end.*

*Id.* at p. 627 (emphasis supplied).

As already noted, Judge Spellman rejected the *dictum* in *Calero–Toledo.* He did not, however, deny that Congress intended to enact a tough, even a harsh, forfeiture law as part of a comprehensive program to eradicate drug trafficking. This court trusts that it is not expressing any disagreement with Judge Spellman. Instead, this court is attempting to make a nice distinction between doing *everything reasonably necessary* to stop the proscribed activity and doing at least *something* to stop it. This court, *consciously* (and not subconsciously, as the Third Circuit worried about), sympathizes with Mrs. Ellis, but nevertheless finds that her implied "consent," as that word is used in this statute, was here granted. The court rejects her argument that the "consent" required by § 881(a)(7) must be overt and that conscious, voluntary, specific permission by an owner is necessary to expose real property to forfeiture. Not only does

this court disagree with Mrs. Ellis' contention that "consent" cannot be "consent" if the alleged illegal activities are contrary to the unvoiced or voiced wishes of a basically passive owner, but "consent" can be implied to a wife, even a wife dominated by an overbearing and abusive husband, if that wife takes *no affirmative action whatsoever* to stop her husband's criminal activity conducted on her property. It might even be a violation of "equal protection" in today's world to require different responses from males and females to their spouses' criminal behavior in order to avoid have "consented" to that behavior. Mrs. Ellis' evidence not only failed to prove that she did everything she could reasonably have done to prevent her criminally inclined husband from misbehaving on her premises (something which probably was not required that she prove), but she failed even to prove that she did *anything*, except perhaps to object verbally in a bland and ineffective way. The court is not prepared to state, and is not required to state, exactly what Mrs. Ellis could have done to avoid being found to have "consented" to the criminal misuse of her property. As pure speculation, perhaps she was required to seek a divorce in order to divorce herself from this possible result. This may be the only way a wife can extricate herself from the predicament Mrs. Ellis found herself in. Without speculating on what exactly she should have done, this court is satisfied that she could have done *something* which she did not do to keep from exposing her property to forfeiture.

In this court's mind, this case is also colored by the fact, upon which the United States no longer depends as the basis for a separate forfeiture theory, that this sixty acres was owned by Mrs. Ellis jointly with Mr. Ellis before his first drug conviction, a fact which the Third Circuit deemed to have possible significance in *Grubb Road.*

This case presents a difficult set of facts and a difficult legal question. It may be the case in which the Eleventh Circuit will establish the law of the Eleventh Circuit as to what constitutes "consent" as that word is employed in § 881(a)(7). The Eleventh Circuit may or may not agree with this court.

### The Constitutional Questions

More than one court has expressed some reservation about the constitutionality of certain aspects of the Comprehensive Drug Abuse Prevention and Control Act of 1970 and its subsequent amendments, which include § 881(a)(7). Although Mrs. Ellis argues loudly that the Act is unconstitutional if applied to forfeit her property under the facts of this case, this court finds no opinion binding on it which would lead to this conclusion. Congress took an aggressive posture, but its statute here being enforced is not as "oppressive" as Mrs. Ellis' counsel says it is, and it is not necessary to its constitutionality that its toughness as a drug enforcement measure be tempered by a liberal construction in favor of the allegedly misused property. This is not a criminal statute. This court, of course, does not disagree with the Eleventh Circuit's expression, quoted by Mrs. Ellis in her post-trial brief, as follows:

> We are not unsympathetic to the government's strong desire to eradicate drug trafficking: we recognize that illegal drugs pose a tremendous threat to the integrity of our system of government. We must not forget, however, that at the core of this system lies the Constitution, with its guarantees of individuals' rights. We cannot permit these rights to become fatalities of the government's war on drugs.

*U.S. v. $38,000.00 in U.S. Currency,* 816 F.2d 1538, 1548–49 (11th Cir.1987).

Mrs. Ellis' constitutional rights have not become a fatality of the war on drugs, because her rights have not been violated. She is no more a victim in the drug war than was Gun South, Inc., in *Gun South Inc. v. Brady,* 711 F.Supp. 1054 (N.D.Ala. 1989), *rev'd,* 877 F.2d 858 (11th Cir.1989). Under these facts, there has been no taking of real property without "due process" or without the payment of "just compensation," and no proceeding of such a quasi-criminal nature as to require the United States to meet a burden of proof beyond that of "probable cause." Her claim of

"fundamental unfairness" falls on ears somewhat stopped up by *Gun South* and the recognition in that opinion of the seriousness of the drug war. Wartime conditions prevail! If *Gun South* did not prove it, the full scale invasion of a foreign country for the purpose of arresting an alleged drug lord surely does.

### Drawing a Geographic Dividing Line on Large Tracts During Forfeiture

Although invited to do so at trial, Mrs. Ellis chose not to try to have this court draw a line which would divide that portion of her sixty acres upon which her husband's drug deals were conducted from that portion of her sixty acres, if any, which was "innocent," i.e., had no "substantial connection" with the "predicate offense." If on appeal Mrs. Ellis proves correct in her suggested definition of "consent," she made a wise choice in this regard because she will have saved her entire sixty acres. If she had raised this issue at trial, an issue recognized and discussed but not resolved in *United States v. Premises at 4492 South Livonia Road,* 889 F.2d 1258 (2d Cir.1989), it would have presented an intriguing but a difficult question which some day must be resolved. The United States argues that all of Texas would be forfeited under a literal reading of § 881(a)(7) if Texas were owned by one person, and if one acre of it was used in a drug deal with the owner's knowledge or consent. The larger the tract and the smaller the portion misused, the more questionable may become the constitutionality of a literal application of the § 881(a)(7) language. This court is happy not to have had to deal with this question.

### Conclusion

For the foregoing reasons, a separate order of forfeiture will be entered.